## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## PALM BEACH DIVISION
## www.flsb.uscourts.gov

*In re:*

ICAN BENEFIT GROUP, LLC, *et. al.*[1]

      Debtors.                                    /

Chapter 11
Case No.: 21-12567-MAM
Case No.: 21-12568-MAM
Case No.: 21-12569-MAM
Jointly Administered with Case No.: 21-12567-MAM

## DECLARATION OF STEPHEN M. TUCKER IN SUPPORT OF FIRST DAY MOTIONS

**BEFORE ME**, the undersigned authority, personally appeared STEPHEN M. TUCKER, in HaywoodCounty, North Carolina, who after being duly sworn, deposes and says as follows:

### Introduction

1. My name is Stephen M. Tucker. I am over the age of 18 and competent to make this declaration (the "Declaration"). I am a registered and licensed insurance agent in multiple states across the country. I am the co-founder, chief executive officer and manager of iCan Benefit Group, LLC ("Benefit Group"), iCan Holding, LLC ("Holding") and On Call Online, LLC ("OnCall" and the foregoing collectively referred to as the "Debtors").

2. I was previously president of Insurance Benefits Group, and before that I was Executive Vice President of Blue Cross Blue Shield, MGA Agency Division.

3. Founded in 2005, Benefit Group is engaged in selling insurance directly to consumers across the United States except Washington State and Alaska. Benefit Group works with a range of providers so that consumers get the most affordable plan with the maximum potential to address their coverage needs.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtors' federal tax identification number, as applicable, are: iCan Benefit Group, LLC (5888); iCan Holding, LLC (8944) and On Call Online, LLC (2496). The Debtors' mailing address is 5301 N Federal Highway, Suite 375, Boca Raton, FL 33487.



4. Benefit Group has sold close to 1 million insurance contracts, including health and life insurance, homeowners, property insurance and other medically related benefits.

5. After having spoken to tens of thousands of consumers, most of whom were frustrated by the need to obtain different types of insurance coverage from different vendors, I innovated the concept of a single insurance advisor, helping consumers navigate and consolidate all of their insurance needs through a single resource.

6. The business model of Benefit Group is actually quite simple notwithstanding a complex behind-the scenes platform. Benefit Group either spends its own money, or is given money by an insurance underwriter to advertise and then sell their policies. In my more than 30 years of experience in the insurance industry, there has always been a direct correlation between what I spend on advertising and the number of consumers who select appropriate coverage for their needs from my companies.

7. Indeed, one such example was Benefit Group having been able to generate 2500 policies a week for Assurant Health; resulting in $22 million in annual, recurring commission income.

8. I have been an industry speaker on telemedicine, health insurance, product development and best practices in marketing insurance.

9. I have served on the advisory boards of United Healthcare, MunichRE, Companion Life of South Carolina, American Medical Security and Florida Blue Cross and Blue Shield, among others.

10. Benefit Group's present cash challenges (as described below), has prevented us investing revenue dollars on advertising and sales development. That notwithstanding, I have recently engaged with a leader in the payroll and employee benefit industry to enroll their 68,000

employees into employer-sponsored health and wellness insurance benefits. Benefit Group was also recently contacted by a publicly traded health tech company to assist them enroll 18,000 employees of independent physician's offices. On behalf of Benefit Group, I continue to pursue other business to business opportunities to grow the company without the up-front, capital intensive requirements of outside marketing.

## Corporate Structure

11. Holding is headquartered in Boca Raton, Florida and is the 100% interest holder of Benefit Group and OnCall.

12. OnCall is the holding company for iCan Benefit Group's telemedicine business. This business allows consumer's access to telemedicine, a safe, fast and convenient way to have access to a doctor for minor health issues 24 hours a day, seven days a week.



## Transactions with Southern Guaranty Insurance Company and Debt Structure

### A. The SGIC Loan

13.     On or about November 7, 2018, SGIC and Benefit Group along with its subsidiaries and/or affiliates, The Law Store Service Company, LLC, iCan Insurance, LLC, iCan IP Holdings, LLC, iCan Media, LLC and InteractiveMD, LLC (the "Initial Borrowers"), entered into the *Loan and Security Agreement* (the "Initial Loan"), pursuant to which SGIC agreed to advance a loan to

the Initial Borrowers in the principal amount of $3,200,000.00[2]. The Initial Loan contains a security agreement securing the loan.

14. Dale Schmidt is the CEO of SGIC and upon good information and belief, owns and/or solely controls SGIC.

15. The Initial Loan is evidenced by the Term Note, executed by the Initial Borrowers, dated November 7, 2018, in the principal amount of $3,200,000.00.

16. SGIC filed a form UCC-1 Financing Statement with the Florida Secured Transaction Registry on November 8, 2018, under File No. 201806977417.

17. On or about March 19, 2019, SGIC and Benefit Group, Holding along with its subsidiaries and/or affiliates, OnCall, The Law Store Service Company, LLC, iCan Insurance, LLC, iCan IP Holdings, LLC, iCan Media, LLC and InteractiveMD, LLC[3] (collectively, the "Borrowers"), entered into the *Amended and Restated Loan and Security Agreement* (the "Amended Loan"), pursuant to which SGIC agreed to advance additional funds to the Borrowers in the amount of $1,926,306.99. The Amended Loan contains a security agreement which secures the loan.

18. There is no promissory note evidencing the additional funds that SGIC agreed to advance under the Amended Loan.

19. SGIC filed a form UCC-1 Financing Statement with the Florida Secured Transaction Registry on March 20, 2019, under File No. 201908175409.

---

[2] It is unclear at this time whether SGIC actually funded the full principal amount. Pursuant to the Amended Loan (as defined herein), SGIC states that it only advanced $2,800,000.00 under the Initial Loan. *See* Initial Loan, § 2.3(a).
[3] The Amended Loan added Holding and OnCall as additional borrowers.

5



20. As additional security for the Amended Loan, I executed and delivered to SGIC a Bad Boy Guaranty ("Bad Boy Guaranty"), dated March 19, 2019, pursuant to which I guaranteed payment to SGIC upon the occurrence of certain "Prohibited Acts."

21. In connection with the Amended Loan, the Borrowers and SGIC entered into the Management Agreement ("Management Agreement"), dated March 19, 2019, whereby the Borrowers were required to retain CD Paradise Management, LLP ("Paradise").

22. Dale Schmidt is also the CEO of Paradise and upon good information and belief, owns and/or solely controls Paradise.

23. Paradise was retained to provide "consulting services as requested from time to time by the [Borrowers] regarding management and operation of the [Borrowers] ..." *See* Management Agreement, § 1.1(a).

24. The Management Agreement prohibits Borrowers from making any payments or expenditures, unless made to SGIC to pay down the Amended Loan, to Paradise for management fees, or pursuant to a budget preapproved by Paradise.

25. Although the Management Agreement severely restricts the Borrowers control of its own finances, Paradise is not required to actually perform any management services under the Management Agreement. *See* Management Agreement, § 1.1(a) ("It is specifically acknowledged and agreed that the Manager is not obligated to provide any specific Management Services, only those Management Services that the Manager agrees to provide from time to time in its discretion.")

26. Additionally, in connection with the Amended Loan, on or about March 19, 2019, Premier Administrative Solutions, Inc. ("Premier") and Benefit Group entered into the Master Services Agreement (the "MSA").

27. Dale Schmidt is also the CEO of Premier and upon good information and belief, owns and/or solely controls Premier.

28. Pursuant to the MSA, Premier was supposed to perform certain services for Benefit Group, including: (i) collection of insurance premium payments, (ii) deposit of insurance premiums into a Premium controlled account, (iii) maintenance account records, and (iv) disbursement payments to Benefit Group and third parties pursuant to established procedures.

29. Additionally, in connection with the Amended Loan, on or about March 19, 2019, SGIC, Premier, Paradise and Dale Schmidt[4] (the "Lender Parties") and the Borrowers and I, entered into the Option Agreement (the "Option Agreement") (collectively, the Amended Loan, Management Agreement, TPA, Bad Boy Guaranty and Option Contract, are defined as the "Loan Documents") whereby the Borrowers granted an option to the Lender parties to purchase substantially all of the assets, or equity interests, of the Borrowers.

30. SGIC now claims to be owed over $11 million.

**Events Precipitating the Bankruptcy Filing**

31. On behalf of SGIC, Mr. Schmidt committed to invest $1.5 million into Benefit Group's marketing and growth, and to fund the growth of the Wal-Mart, in-store insurance agency pilot program. ("Walmart Program").

32. The Walmart Program consisted of three pilot stores where Benefit Group would place a store-front in Walmart Superstores across the country, exposing Benefit Group's products and brands to over 2 million customers annually, per Walmart store.

---

[4] Dale Schmidt is the control person for SGIC, Premier and Paradise. Mr. Schmidt signed the Option Agreement as Chairman of SGIC, Chief Executive Officer of Premier, Chief Executive Officer of Paradise, and on behalf of himself personally.

7



33. Benefit Group opened the 3 pilot stores, but instead of providing Benefit Group with the marketing capital and funding for the Walmart Program, Mr. Schmidt, through his management company, CD Paradise, actually prohibited Benefit Group from developing the Walmart Program.

34. Approximately 6 months after receiving the Amended Loan from SGIC, Mr. Schmidt, on behalf of SGIC, advised me that SGIC would not be funding any future loans at all. As explained to me by Mr. Schmidt, the State of Wisconsin Department of Insurance would not allow SGIC to lend Benefit Group any future monies.

35. Shortly after being advised that SGIC would cease lending to Benefit Group, Mr. Schmidt, through CD Paradise, began imposing certain management decisions upon Benefit Group that had the direct and immediate effect of impairing cash flow. For example, Mr. Schmidt required Benefit Group to factor its receivables with an entity located in the U.S. Virgin Islands which, upon good information and belief, is owned and/or controlled directly by Dale Schmidt. The effective rate of the factoring arrangement was approximately 24% per year. The debt service to Mr. Schmidt's factoring company further impaired Benefit Group's cash flow and caused Benefit Group's loan with SGIC to go into default. That, in turn, caused Benefit Group to incur late fees and penalties under the terms of the Amended Loan with SGIC.

36. In addition to the cash crisis caused by the exorbitant debt service to the factor, CD Paradise (another of Mr. Schmidt's entities) required Benefit Group to terminate its accounting staff on the promise that CD Paradise (represented to me as a management company with a full staff of accounting personnel) would provide those services. However, CD Paradise did not and does not perform financial management services for Benefit Group. As a result, when Benefit

Group could not produce a budget for SGIC, both Benefit Group and myself individually plunged further into default of the SGIC loan documents and the Bad Boy Guaranty.

37. SGIC also directed the termination of Benefit Group's in-house counsel, Tim Moore. This resulted in further litigation claims by Mr. Moore against the Debtors and additionally impaired the Debtors' ability to operate.

38. In or about January 2021, Benefit Group was served with correspondence from Mr. Schmidt on behalf of SGIC wherein he declared a default and demanded payment of SGIC's entire loan or, in the alternative, surrender of all of Benefit Group's assets. I explained to Mr. Schmidt that my obligations to the company, its customers, employees and other creditors prevented me from stripping Benefit Group of all of its assets with no provision for its liabilities. Thereafter in early March 2021, Mr. Schmidt, again on behalf of SGIC, gave me written notice that he was exercising his Option to take over Benefit Group's assets.

39. In connection with this notice Mr. Schmidt, in his capacity as President and CEO of SGIC, directed Premier to cease making payments under the MSA to Benefit Group, and instead direct those payments to SGIC. Mr. Schmidt then demanded that Benefit Group close on an assignment of assets that would have stripped the company of any value in favor of SGIC.

40. As of the date of this Declaration, and notwithstanding the automatic stay resulting from the Debtors' bankruptcy filings, I have not received notice that SGIC has withdrawn its notice to Premier.

41. Based on SGIC's own valuation as of August 2020, the block of policies owned by Benefit Group has a "Closed Block Runoff" value of $17.5 million. This valuation approach assumes Benefit Group ceases operations and does not sell another policy. When this Closed

Block Runoff valuation was done by Mr. Schmidt and SGIC in August 2020, Benefit Group had approximately 10,500 policies. On the Petition Date Benefit Group had 10,743 policies. The Closed Block Runoff, therefore, between August, 2020 and the Petition Date is materially unchanged, if not somewhat improved.

42. However, SGIC's valuation of Benefit Group's block of policies as a going concern reflects a range of value between $30 million and $60 million. This Closed Block Runoff and going concern approach to valuation of Benefit Group's block of policies is the approach SGIC has consistently taken for the last two years, and when presenting valuations to prospective purchasers and lenders, until now. Now, in connection with SGIC's attempt to exercise (i) the surrender of assets; and (ii) the option, SGIC departed from prior methods of valuation, using only the Closed Block Runoff approach, but then discounting that value to present day – effectively a forced liquidation.

## First Day Filings

**Application for Approval, on an Interim and Final Basis, of Employment of Robert P. Charbonneau, Esq. and the Law Firm of Agentis PLLC as General Bankruptcy Counsel for the Debtor-In-Possession, Effective as of the Petition Date ECF# 19**

43. On March 22, 2021, the Debtors filed their *Emergency Application for Approval, on an Interim and Final Basis, of Employment of Robert P. Charbonneau, Esq. and the Law Firm of Agentis PLLC as General Bankruptcy Counsel for the Debtor-In-Possession, Effective as of the Petition Date* [ECF# ---], seeking to employ and retain Agentis PLLC as their general bankruptcy counsel.

44. The counsel and guidance provided by Agentis has been invaluable to the Debtors to date, and the Debtors cannot effectively navigate these proceedings without counsel.

agentis

55 Alhambra Plaza · Suite 800 · Coral Gables, Florida 33134 · T. 305.722.2002 · www.agentislaw.com

**Emergency Motion for Entry of an Order Authorizing the Debtor to Pay Critical Vendor Claims in the Ordinary Course of Business [ECF# 8]**

45. On March 19, 2021, Benefit Group filed its' *Emergency Motion for Entry of an Order Authorizing the Debtor to Pay Critical Vendor Claims in the Ordinary Course of Business* [ECF# 8], seeking critical vendor status for Administration 123.

46. Admin 123 houses all of Benefit Group's customer, policy and sales force information, as well as all historic interactions with customers, including member services and billing, and is the key connection to credit card and ACH systems. Without Admin 123 Benefit Group would effectively be unable to not only sell other polices, but service, collect and bill its existing and new clients. As I understand the Doctrine of Necessity, Admin 123 provides an indispensable service that cannot be replaced by another vendor.

47. The services provided by Admin 123 are irreplaceable by the Debtors, and the $20,068.75 in critical vendor payments is, in my opinion, a small price to pay for continuing this service.

**Emergency Motion By Debtors-In-Possession Pursuant to 11 U.S.C. §§ 105, 361, 362, and 363, Bankruptcy Rules 4001(B) and 6003, And Local Rules 4001-2 and 9013-1 for Interim Order (A) Authorizing Use Of Cash Collateral; (B) Finding That Secured Creditor is Adequately Protected; and (C) Scheduling Final Hearing [ECF#13]**

48. On March 21, 2021, Benefit Group filed its' *Emergency Motion By Debtors-In-Possession Pursuant to 11 U.S.C. §§ 105, 361, 362, and 363, Bankruptcy Rules 4001(B) and 6003, and Local Rules 4001-2 and 9013-1 for Interim Order (A) Authorizing Use Of Cash Collateral; (B) Finding That Secured Creditor is Adequately Protected; and (C) Scheduling Final Hearing* [ECF#13], seeking entry of a Court order (a) authorizing the Debtors to use cash collateral on an interim basis; (b) approving adequate protection arrangement to secured creditor SGIC; and (c) scheduling a final hearing.

agentis

55 Alhambra Plaza · Suite 800 · Coral Gables, Florida 33134 · T. 305.722.2002 · www.agentislaw.com

49. The Debtors seek the use of cash on an interim basis and pursuant to the budget attached as Exhibit "A" to the motion. The majority of funds that the Debtor proposes to use for payroll and rent during the interim period are, in fact, not the collateral of SGIC, but rather are funds received from the federal government's Paycheck Protection Program loan.

50. The remaining funds are subject to SGIC's assertion of a lien on cash, but using such cash will not only not diminish the value of SGIC's collateral, but actually enhance it for all the reasons set for in this Declaration and the this motion.

**Debtors' Emergency Motion For An Order Authorizing the Payment of Prepetition Wages, Related Expenses and Employee Benefits; and Authorizing Financial Institutions to Honor All Related Checks and Electronic Payment Requests [ECF# 11]**

51. On March 19, 2021, Benefit Group filed its' *Emergency Motion For An Order Authorizing the Payment of Prepetition Wages, Related Expenses and Employee Benefits; and Authorizing Financial Institutions to Honor All Related Checks and Electronic Payment Requests* [ECF# 11], seeking entry of an order authorizing, but not directing, the Debtor to pay Pre-Petition Wage Obligations.

52. The Debtor relies on its loyal employees and agents, which consist mostly of insurance agents in Florida and Texas plus office and operational support personnel to continue operations of its business and preserve its going concern value. These personnel likewise depend on the Debtor for their livelihood and will be exposed to significant financial difficulties if the Court does not permit the Debtors to pay the Pre-Petition Wage Obligations (as defined in the motion) in the normal course of business.

53. None of the employees sought to be paid through this motion are entitled to pre-petition compensation that exceeds the $13,650.00 priority wage limit set forth in section 507(a)(4) of the Bankruptcy Code.

agentis

55 Alhambra Plaza · Suite 800 · Coral Gables, Florida 33134 · T. 305.722.2002 · www.agentislaw.com

54. The Debtor believes that, in order to ensure that the employees remain with the Debtor during its Chapter 11 case, and in order to maintain employee morale and productivity, it is necessary to pay, in the ordinary course of the Debtor's business, the Pre-Petition Employee Obligations described in this motion that are owed to or payable for the benefit of the Debtor's current employees. Payment of these amounts will encourage the employees to continue to work for the Debtor, promoting the prospects for a successful Chapter 11 case, confirmation of a plan of reorganization, and ultimately enhance potential recoveries for creditors.

Aagentis

55 Alhambra Plaza · Suite 800 · Coral Gables, Florida 33134 · T. 305.722.2002 · www.agentislaw.com

**FURTHER AFFIANT SAYETH NAUGHT.**

By: <u>Stephen M. Tucker</u>
Title: <u>Sole Member & CEO</u>

**SWORN TO AND SUBSCRIBED** before me by means of ☐ physical presence or ☐ online notarization, this ____ day of March 2021, by _____, who is personally known to me or has produced: _____ as identification.

_____
NOTARY PUBLIC, STATE OF FLORIDA
AT LARGE

NOTARY PUBLIC, STATE OF FLORIDA
Print Name: _____
Commission No.: _____
My Commission Expires: _____

agentis

55 Alhambra Plaza · Suite 800 · Coral Gables, Florida 33134 · T. 305.722.2002 · www.agentislaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served by transmission of Notices of Electronic Filing generated by CM/ECF to those parties registered to receive electronic notices of filing in this case this ___22nd___ day of March 2021.

        AGENTIS PLLC
        ***Proposed Counsel for Debtors-in-Possesion***
        55 Alhambra Plaza, Suite 800
        Coral Gables, Florida 33134
        T. 305.722.2002
        www.agentislaw.com

By: _____
        Robert P. Charbonneau
        Florida Bar No: 968234
        rpc@agentislaw.com
        Jacqueline Calderin
        Florida Bar No: 134414
        jc@agentislaw.com